# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1876.

### CHARLES HOLDEN v. THE STATE.

1. INDICTMENTS which do not conclude "against the peace and dignity of the state" are fatally defective, whether excepted to or not.

2. MURDER—CHARGE ON THE DEGREES.—Unless there is evidence making it requisite that the distinctions between the degrees of murder be given in the charge to the jury, it is not error to refuse a charge asked on the second degree; but if the judge is in doubt as to which degree is established by the evidence, then he should charge the law relative to the less as well as the greater degree.

3. SAME.—See the opinion *in extenso* upon the subject of instructing juries. in the trial of offenses which admit of degrees, and the order in which such instructions, when proper, should be given.

4. STATUTES — REPEAL BY IMPLICATION. — A subsequent statute which revises the entire subject-matter of a prior one, and which is intended as a. substitute therefor, repeals the prior one, though it contain no repealing clause.

5. SAME.—An act of 1866 provided that Wilbarger county should, for judicial purposes, be attached to the county of Clay when the latter should be organized. In pursuance of requirements of the Constitution of 1869, two acts were passed in 1870 creating judicial districts throughout the state, and prescribing the terms of the district courts therein, whereby the then unorganized counties of Clay and Wilbarger were attached for judicial purposes to the county of Montague. Clay county was organized in 1873, and subsequently the appellant was there indicted and tried for murder committed in Wilbarger county in 1874. *Held,* that the two acts of 1870 superseded and repealed the act of 1866, with its provisions for attaching Wilbarger county to Clay when organized; and, consequently, the district court of Clay county had no jurisdiction of the offense charged against appellant.

6. TITLE OF STATUTE.—The two acts of 1870, above referred to, had for their general object the organization of the district courts and the administration of the law in all the counties of the state, and their provisions for attaching unorganized counties to organized districts and counties for judicial purposes were germane to that general object, and, therefore, not violative of the constitutional inhibition against embracing in an act an object not expressed in its title.

**15**

7. ARRAIGNMENT.—The ruling in *Early* v. *The State, post* p. 248, on the neces-
sity of arraignment of the accused in capital cases, referred to and
approved.

8. TRANSCRIPTS.—District clerks are admonished to comply with the rule
which requires transcripts to be tied, and the seal of the court to be placed
over the tie.

APPEAL from the District Court of Clay. Tried below
before the Hon. J. M. LINDSAY.

The indictment was found in the district court of Clay
county on the 7th of August, 1874, and charged the
appellant with having murdered one F. Jacoby, in the
county of Wilbarger, on the 8th of May, 1874. At the
April term, 1875, the accused filed exceptions to the indict-
ment, specifying among them that it was presented in a
court having no jurisdiction of the offense; that it was not
the act of the grand jury of the proper county; and that
the place where the indictment charged the offense to have
been committed was not within the jurisdiction of the
district court of Clay county. There was no exception
because the indictment did not conclude, "against the peace
and dignity of the state." The exceptions were overruled,
and the case proceeded to trial at the same term. Neither
arraignment nor plea is shown by the record.

J. M. Kelley, first lieutenant of Co. C, 10th U. S. cavalry,
being sworn for the state, testified that the accused was a
member of his company. Witness knew F. Jacoby, who
died in Wilbarger county, on the 9th of May, 1874, from
the effect of four shots from a Colt's revolver; saw him
about half an hour before he was shot, at witness' camp on
Beaver creek, in Wilbarger county. He and John Jacoby,
his brother, were peddling whisky and other articles. On
the evening of the killing their camp was about a quarter
of a mile from, and out of sight of, witness' camp. Wit-
ness sent a sergeant to tell them either to come back to his
camp or to move out that evening. Shortly afterwards

there was a commotion, and witness thought there was an attack by Indians, and, running towards Jacoby's camp, he saw F. Jacoby coming from that direction. He fell down several times while approaching, and witness found that he had been shot, and, running on to Jacoby's camp, there found John Jacoby dead, having been shot twice in the body, which was still warm. Witness then returned to his own camp and had his men to fall into line and march past F. Jacoby, who was then lying in a tent, where the surgeon was attending to his wounds. He repeatedly said he was going to die, and expressed no hope of surviving his wounds, but proceeded to dispose of his effects—subsequent to which he made a statement voluntarily, and not in answer to questions. Witness had it reduced to writing by another officer, and read it twice to F. Jacoby, who said it was correct, and signed his name to it in witness' presence, and was sworn to it by witness.

The witness having produced the statement, the state put it in evidence to the jury, the following being the substantial portions of it:

" On the 8th of May, 1874, deponent (F. Jacoby) and his brother, John Jacoby, while encamped with their wagon on Beaver creek, Texas, near the so-called Camp Beaver, occupied by the United States troops composed of C and M, 10th U. S. cavalry, deponent and his brother [were attacked] by a colored man dressed in the uniform of the United States troops, and his brother, the said John Jacoby, was killed. Deponent further says, at the time of the attack his brother, the said John Jacoby, was lying under the wagon, and deponent was engaged in fixing one of the double-trees of the wagon; and, while thus engaged, that one of the colored men (there being two present at the time) asked deponent how long he and his brother were going to stay there, and deponent replied until to-morrow morning. Deponent then went about cooking supper, when

one of the men fired six shots from a pistol, two of said shots taking effect on the body of the said John Jacoby and killing him, and four shots taking effect in the body of deponent. Deponent further says that he recognizes the man who fired the shots at him and his brother as private Charles Holden, said to belong to Co. C, 10th U. S. cavalry, and is confident he cannot be mistaken in his identity.''

Sergeant Haynes, of Co. M, 10th U. S. cavalry, another witness for the state, proved that the accused borrowed his Colt's army pistol the evening of the killing, on the pretext that he was ordered to go after wood; that the pistol was loaded when borrowed by accused, and witness asked him not to waste the loads, as cartridges were scarce; that soon afterwards witness heard shots in the direction of the camp of the deceased, and soon after that saw accused in his company grounds, and told him to bring the pistol; that accused took witness into his tent and gave witness the pistol; that the cylinder was hot, and witness asked accused why he had shot off the loads, and accused replied that he had shot the men at the creek with it, and he would give witness a bottle of whisky and a piece of tobacco not to report him; that witness at once reported to Lieutenant Kelley what the accused had said. The witness further proved that when the men were marched past F. Jacoby he recognized and pointed out the accused as the man who shot him and his brother.

The judge trying the case charged the jury on the law applicable to murder in the first degree only, with the usual presumption of innocence and reasonable doubt doctrine, and apprised them of their power, under the Constitution of 1869, to substitute imprisonment at hard labor for life in case they found the accused guilty.

No instruction on the second degree of murder was asked in behalf of the accused.

A general verdict of guilty of murder in the first degree

having been returned by the jury, the accused moved for a new trial, assigning that the court erred in overruling his exceptions to the indictment; in failing to charge the jury in regard to murder in the second degree; in its charges to the jury generally; and because it was on the weight of evidence.

This motion being overruled, the accused appealed to the supreme court, from which the case was transferred to the court of appeals, created by the Constitution of 1876. Being submitted to this court at its Austin term, 1876, this court took it under advisement at the adjournment of that term, and, at the ensuing term at Tyler, decided it in the opinion by Winkler, J., which concludes this report of the case.

*J. D. Woods*, for the appellant. The 5th section of the judge's instructions, it is submitted, cannot be sustained in its application to this case. It in effect declares that there can be no doubt as to the proof of express malice, and that the offense, if anything, is murder in the first degree.

How such a charge can be sustained on principle, under any state of facts, is not readily perceivable. The court can refuse to charge upon the degrees of homicide below murder in the second degree, because where the killing is proven it requires evidence to reduce the offense to manslaughter, and it is the province of the court to decide whether there is any evidence on a given point; but the case is different in regard to evidence necessary to raise the offense to murder in the first degree. It is not then a question whether or not there is evidence to reduce the crime to murder in the second degree, but whether the evidence is sufficient, beyond a reasonable doubt, to raise the offense from murder in the second degree to that in the first. A charge which assumes that it is sufficient for that purpose is directly upon the

weight of evidence, in the very point of the case which involves the life of the defendant. And though resort may be had to the supreme court to prevent an abuse of charges. of this character, the fact still remains that the facts on which the prisoner's life depends are passed on only by the district and supreme courts, and not by the jury who are properly their judges.

I am aware that similar charges have been sustained by former courts, but it is submitted that they are wrong in principle, and, in view of the dangerous power which they place in the hands of the district judge, and the consequences. which may flow from them where a human life is at stake,. they should be carefully scrutinized and jealously confined to the only cases in which it is believed they have thus far been allowed—that is, to those where the circumstances. show beyond any possible doubt that the offense of murder in the first degree has been committed, and the only question made on the trial is as to whether the defendant was. the one who committed it.

In the case at bar there is no evidence of express malice,. but apparently no doubt that the defendant was the person who did the killing. It may not be proper to allude to what. the evidence in the case discloses must have been the line of defense adopted by the counsel representing the prisoner— they in effect admitting that the evidence was sufficient to sustain a conviction for murder in the second degree, and basing their defense entirely on the question of express. malice.

Though, in a case where no issue was in fact made as to the question of the degree of the murder, such a charge might work no hardship upon a defendant, it is submitted that, in the present instance, a charge taking away from the jury the only question of fact which made any serious claim upon their attention is an error of so grave a character as.

to practically take from the accused the right of trial by jury, and to demand a reversal of the cause.

*A. J. Peeler*, Assistant Attorney General, for the State.

1. As to jurisdiction :   The offense is alleged in the indictment to have been committed in Wilbarger (an unorganized county) on the 8th day of May, 1874. The indictment was presented in Clay county August 7, 1874. It is insisted by counsel that Wilbarger was not at this time attached for judicial purposes to Clay. Section 6 of the act of February 14, 1860, is as follows :   "The counties of Clay, Wichita, Wilbarger, Hardeman, and Greer shall be attached to the county of Montague, and when the county of Clay is organized the counties of Wichita, Wilbarger, Hardeman, and Greer shall belong to the county of Clay." Section 2 of the act of November 6, 1866, is as follows : "That the counties of Clay, Wichita, Wilbarger, Hardeman, and Greer be, and the same are hereby, attached to the county of Montague for judicial and other purposes ; and when the county of Clay is organized the counties of Wichita, Wilbarger, Hardeman, and Greer shall belong to the county of Clay."

By the first and last-named acts the county of Wilbarger was attached only to Montague until Clay should be organized. Its attachment to Clay was designed to be temporary ; the chief and manifest purpose of both acts was that when Clay should be organized it should be attached to that county.

"An act to organize Clay county" was passed May 27, 1873. Pamphlet Laws, 106. It is not denied that Clay county was organized at the date of the offense, indictment, and trial. If the act of November 6, 1866, be constitutional —and of this there is no question—Wilbarger unquestionably belongs to Clay, unless said act was repealed. Appellant insists that it was so repealed by the acts of July 2, 1870,

(Pamphlet Laws, 21) and August 10, 1870 (Pamphlet Laws, 51). The title of the latter act is, "An act prescribing the times of holding the district courts in the several judicial districts in the state." I insist that this did not repeal the act of November 6, 1866, because, 1st, said act of August 10, 1870, is unconstitutional in this, that, in attempting to attach unorganized counties to others for judicial purposes, it embraced an object not expressed in its title (sec. 17, Art. 12, Const. 1869), and as to such object is void. See, on this subject, *The State* v. *McCracken*, 42 Texas, 383; *State* v. *Shadle*, 41 Texas, 404; *San Antonio* v. *Gould*, 34 Texas, 73; 1 Pasc. Dig. of Dec., sec. 7317, p. 616; Cooley on Const. Lim. (2d ed.) 141, *et seq.* See, also, a number of recent cases collected in Abbott's U. S. Dig. (N. S.), vol. 2 (1871), p. 655; vol. 3 (1872), p. 656; vol. 4 (1873), p. 643. In view of the difficulty which similar constitutional provisions have given the courts, I have given the court the benefit of such references generally as were accessible, not having the time to distinguish between, or criticise, the cases.

2d. If the act of August 10th, 1870, be constitutional, does it repeal the act of November 6, 1866? I insist that it does not. It is not repealed in express terms. Is it repealed by necessary implication? See the Texas cases collected in 3 Pasc. Dig. of Dec., sec. 16,950, p. 1528, and sec. 21,899, p. 2006. Wilbarger, at the time of the passage of the act of 1870, was still unorganized; that act simply continued its attachment to Montague. It contains nothing which, by necessary implication, would prevent its being attached to Clay on the organization of Clay. The condition in the act of 1866 was not inconsistent with the act of 1870; the two, in this respect, may stand. As to this condition the subsequent act was not intended to supply or take the place of the other, and, as repeals by implication are

not favored, it should not be construed to have this effect unless clear that it was so intended.

The 5th instruction which is complained of is as follows: "If you find and believe from the evidence that the defendant, Charles Holden, on any day before the filing of this bill of indictment, in the county of Wilbarger, did, with express malice, kill and murder F. Jacoby, as alleged in the indictment, you will find the defendant guilty of murder in the first degree. If you do not so believe you will find the defendant not guilty."

This instruction must be considered, not as an isolated instruction, but in connection with the charge as a whole. "It is not error to refuse to charge the law of manslaughter, or the distinction between murder in the first and second degrees, unless there be something in the evidence which, if believed by the jury, would reduce the offense to manslaughter, or to murder in the second degree." *Hudson* v. *The State*, 40 Texas, 706; *Thomas* v. *The State*, 40 Texas, 36. The court is only required to charge the law applicable to the case; and where this is done, unless by some material misdirection defendant is injured, and no exceptions are taken, and no counter-instructions asked, the defendant cannot complain. *Marshall* v. *The State*, 40 Texas, 200.

Unless the facts of the case make it necessary for the court to draw distinctions, it is not its duty to do so. *Vaughan* v. *The State*, 21 Texas, 752; *Ross* v. *The State*, 29 Texas, 499; *O'Connell* v. *The State*, 18 Texas, 344; *Johnson* v. *The State*, 27 Texas, 706; *Hudson* v. *The State*, 40 Texas, 13; *Jones* v. *The State*, 40 Texas, 188. See, also, *Mayfield* v. *The State*, Tyler term, 1875; and *Powell* v. *The State*, same term.

WINKLER, J. This proceeding was had under the state Constitution of 1869, which required all prosecutions to be

carried on in the name and by the authority of the state of
Texas, and to conclude "against the peace and dignity of
the state." Art. 5, sec. 15. The former Constitution of
1845, which was in force at the date of the adoption of the
Code of Criminal Procedure, contains the same provision.
The Code of Criminal Procedure, Article 395, defining the
requisites of an indictment, says, in the 8th subdivison of
the Article, "the indictment must conclude 'against the
peace and dignity of the state.'" Pasc. Dig., Art. 2863.

The omission to state in the indictment that the offense
was committed "against the peace and dignity of the state,"
as required by the Constitution then in force, and by the
Code then and now in force, has repeatedly been held by
our supreme court to be fatal to the indictment. In the
case of *The State* v. *Durst*, 7 Texas, 74, the court say : "It
is scarcely necessary to say that the courts have no author-
ity to dispense with that which the Constitution requires."
The opinion in *The State* v. *Durst* is quoted approvingly
in the case of *The State* v. *Sims*, decided at the Austin term,
1875, of the supreme court ; and the learned Chief Justice
Roberts adds : "It (the omission to conclude with the words
"against the peace and dignity of the state") has been held
to be a fatal defect, whether excepted to or not." See, also,
the cases cited in the opinion of the court in *The State* v.
*Sims*, 43 Texas, 521.

In the indictment in this case this omission is made, and
on that account alone the conviction had would be set aside.
*Sutton* v. *The State*, 41 Texas, 513 ; and *White* v. *The
State*, and *Trammell* v. *The State*, decided by this court at
the Austin term, 1876, *ante* pp. 211, 121.

Two other propositions are discussed by counsel : 1st, as to
the jurisdiction of the court in which the trial was had ; and,
2d, the correctness or otherwise of the charge of the court
to the jury. We will notice these propositions in inverse
order.

Then as to the question, did the district judge err in his instructions to the jury? It is contended on the part of the accused that it is the duty of the judge, on a trial for murder, to charge on the different degrees in murder as a rule ; that to refuse to charge as to murder of the second degree is equivalent to charging that the defendant is guilty of murder in the first degree, and is, consequently, a charge as to the weight of evidence. Such seems to be the purport of his argument. We do not so understand the law.

It is evidently the intention of the framers of the law that the judge who presides at the trial of a felony shall take the responsibility of instructing the jury as to the law of that particular case. Whilst the jury are exclusive judges of the facts, and an invasion of their prerogative cannot be allowed, yet they are not the judges of the law in any case. "They are bound to receive the law from the court and be governed thereby." Code of Cr. Pro., Art. 593 ; Pasc. Dig., Art. 3058. It is the duty of the judge to state plainly to the jury the law of the case, but it is beyond his province to discuss the facts, or use any argument in his charge to rouse the sympathies or excite the passions of the jury. Code of Cr. Pro., Art. 595 ; Pasc. Dig., Art. 3060. Either party may ask the judge to give a charge, but the judge may give it or not, as in his judgment would be proper. Pasc. Dig., Art. 3061. But it is the imperative duty of the judge, in all cases of felony, whether asked to do so or not, to give written instructions to the jury, "in which he shall distinctly set forth the law applicable to the case." Code of Cr. Pro., Art. 594 ; Pasc. Dig., Art. 3059. In the language of the supreme court in *Hudson* v. *The State*, 40 Texas, 15, " the charge of the court should instruct the jury upon the law applicable to the case as made by the proofs."

Again, counsel for the appellant argues that the court can refuse to charge upon the degrees of homicide below

murder in the second degree, because, when the killing is proved, it requires evidence to reduce the offense to manslaughter, and it is the province of the court to decide whether there is any evidence on a given point; but, he continues to argue, the case is different in regard to evidence necessary to raise the offense to murder in the first degree. Taking in view that these matters of different degrees in murder are but different degrees of the offense of murder—to be visited by a degree of punishment corresponding with the turpitude shown by the proofs—we hold that it would be better to commence at the offense of murder and give the jury instructions as to what it takes to constitute murder, and explain the law as to malice express and implied, and, having done so, to then proceed to charge as to the degrees of homicide or not, as in the judge's judgment may be proper after he shall have heard the evidence. Say the court in the opinion last quoted from: " When the facts in evidence shall conduce to establish that the defendant may be guilty of something less than that with which he is charged, where the offense admits of degrees, the difference between the different degrees should be explained to the jury by instructions from the court." *Hudson* v. *The State*, 40 Texas, 15.

The practice seems to be settled that the court, in charging with reference to the law of offenses admitting degrees, should commence with the highest degree of the offense the proof justifies. If the judge should believe from the evidence that the party accused is guilty of murder in the first degree, he is not required to do more than charge as to murder in the first degree. If, however, the evidence should, in the mind of the judge, show that the accused is guilty in a less culpable degree, he should then charge as to the second degree of the offense; and a case would not be reversed because of a refusal on the part of the judge to

charge as to the lesser degrees of the offense, unless it·
should appear from the evidence that such charge should·
have been given.

Murder may be of the first degree and punishable with
death, or the jury, under the former Constitution, could·
commute the punishment to imprisonment for life; and so
murder may be of the second degree and punished less
severely. The evidence determines the degree, and the·
judge should charge as to either one or both degrees, as the·
proof requires, and, if he errs, the remedy is by appeal. It
is not error, in a proper case, for the court to decline to do
more than charge the jury as to murder in the first degree.

In *Hudson* v. *The State* it was argued that the facts did·
not present a case of murder in the first degree, or at least
that the court should have instructed the jury on the degrees·
in murder. But the court say: " There is nothing in the
evidence that made it necessary for the court to explain to
the jury the degrees in murder, or to instruct them upon·
the law applicable to the difference between murder in the
first and second degrees, or the constituents of manslaughter·
as distinguished from murder." From this reasoning it
must be apparent that the propriety or impropriety of giving·
or withholding a particular charge must be determined from·
the evidence alone.

In *Jones* v. *The State*, 40 Texas, 188, it appears from the·
opinion of the court that the court below confined the charge
to killing upon express malice, and did not draw the dis-
tinction between murder in the first and murder in the·
second degree; yet the court declined to set aside the con-
viction of murder in the first degree because the evidence
justified the verdict.

From these authorities we conclude, 1st, that, on the trial·
of a felony case, the judge who presides at the trial is·
responsible for the law applicable to the particular case·
then on trial; 2d, that the court is required to instruct the·

jury as to the law applicable to that particular case, as developed by the evidence adduced on the trial; 3d, that it is not indispensable that the court should charge as to different degrees of the offense charged, unless in its judgment the evidence to be passed upon by the jury renders such charge necessary in order that the jury may understand the application of the facts to the law governing the different degrees of the offense; though, if after hearing the evidence the court should be in doubt, then the law as to the less offense should be charged; and, 4th, that the failure to instruct the jury as to the different degrees of an offense will not necessarily be ground of reversal, unless this court, on an inspection of the evidence as shown by the record, shall be of opinion that the evidence required the instruction as to the different degrees of the offense.

This appellant is charged with killing with express malice. Murder committed with express malice is murder in the first degree.    Penal Code, Art. 608; Pasc. Dig., Art. 2267.

"Express malice is when one, with a sedate and deliberate mind and formed design, doth kill another; which formed design is evidenced by external circumstances discovering that inward intention, as by lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some serious bodily harm."    4 Bl. 198; *McCoy* v. *The State*, 25 Texas, 33.

This prosecution is for a killing upon express malice. We have carefully examined the charge complained of, and, taking it all together, we are unable to find that it was not warranted by the evidence.

As to the question of jurisdiction: The indictment states that the grand jury was charged to inquire of offenses committed in Clay and Wilbarger counties, and the offense is charged to have been committed in Wilbarger county. The prosecution was in Clay county, and the evidence shows the killing to have been in Wilbarger county.

As a general rule, prosecutions should be in the county where the offense is committed. This is the general rule; but to this there are exceptions. It is not pretended that this case is within any of the exceptions to the general rule; on the contrary, it is claimed by the state that Clay county had jurisdiction, on the ground that Wilbarger county, being unorganized, had been attached to Clay county for judicial purposes.

This leads us to notice the several acts of the legislature bearing upon the subject.

In 1860, it seems, an act was passed attaching certain counties, and among them Clay and Wilbarger, to Montague county, for judicial purposes, and providing that, when the county of Clay is organized, the counties of Wichita, Wilbarger, Hardeman, and Greer shall belong to the county of Clay. In 1866, November 6, the legislature passed another act providing that the counties of Clay, Wichita, Wilbarger, Hardeman, and Greer be attached to the county of Montague for judicial and other purposes, and that, when the county of Clay is organized, the counties of Wichita, Wilbarger, Hardeman, and Greer shall belong to the county of Clay.

In both these acts the evident intention was to attach, temporarily, the counties of Clay and Wilbarger to Montague county, and that, upon the organization of Clay county, Wichita, Wilbarger, and other counties were to be attached to the county of Clay for judicial and other purposes. It is hardly to be supposed that, by the employment of the words "belong to Clay," the legislature intended to incorporate those counties with Clay permanently, but only to attach them to Clay for judicial purposes, just as Clay and Wilbarger, and other counties, had before that time been attached to Montague county.

In 1873 an act was passed providing for the organization of Clay county, and by the most liberal construction, which is conceded by appellant's counsel, carried to it for judicial

purposes the county of Wilbarger, unless, indeed, the act of 1866 had been repealed by legislation had subsequently to the passage of the act of November 6, 1866, and prior to the organization of Clay county, in 1873.

In 1869 the organic law of the state was changed by the adoption of a new Constitution, which went into operation on the 30th day of March, 1870. By this Constitution it was provided that "the state shall be divided into convenient judicial districts, for each of which one judge shall be appointed, * * * who shall hold a court three times a year in each county thereof, at such time and place as may be prescribed by law." Art. 5, sec. 6.

After the Constitution of 1869 went into effect the legislature passed an act of which the caption is as follows: "An act to provide for districting the state of Texas into judicial districts," which was approved July 2, 1870. From this act of July 2, 1870, the following extract is made:

"Sec. 12. The twelfth district shall be composed of the counties of Grayson, Cook, Denton, Montague, and Wise, and the following unorganized counties shall be attached to this district for judicial purposes, viz.: Archer, Wichita, Baylor, Wilbarger, Knox, Hardeman, and Clay."

Subsequently, at the same session of the legislature, an act was passed entitled "An act prescribing the times of holding of the district courts in the several judicial districts of the state," approved August 10, 1870, from which the following is an extract:

"Sec. 13. The district courts of the twelfth judicial district shall be holden at the times hereinafter specified, to wit, * * * in the county of Montague on the fourth Mondays in October, February, and June, and may continue in session two weeks; * * * that for judicial purposes the counties of Clay, Hardeman, Knox, Wilbarger, Baylor, Wichita, and Archer shall be attached to the county of Montague."

It is contended on the part of the appellant, and denied by counsel on the part of the state, that the act of 1870 repeals the act of 1866.

By the act of November 6, 1866, the counties attached to Montague for judicial purposes were Clay, Wichita, Wilbarger, Hardeman, and Greer; and of these the four counties of Wichita, Wilbarger, Hardeman, and Greer were to belong to Clay when organized.

By the act of the 2d of July, 1870, the following unorganized counties were attached for judicial purposes to the twelfth judicial district, viz.: Archer, Wichita, Baylor, Wilbarger, Knox, Hardeman, and Clay; and by the act of the 10th of August, 1870, the same counties last above named were attached for judicial purposes to the county of Montague.

What is the proper construction of these several statutes with reference to the jurisdiction of Clay county over a felony charged to have been committed in Wilbarger county on the 8th day of May, 1874?

It would, perhaps, be sufficient to say that the law of 1866 is repealed by the law of the 10th of August, 1870. The repeal is in these words: "That all laws and parts of laws conflicting with the provisions of this act be, and the same are hereby, repealed." Sec. 38 of the act of August 10, 1870; Pamphlet Acts of the twelfth legislature, called session, p. 59. The act of 1866, which attaches the counties of Clay, Wichita, Wilbarger, Hardeman, and Greer to Montague for judicial purposes until Clay county should be organized, is evidently in conflict with the act of the 10th of August, 1870, which attaches these four counties, and the three other counties of Knox, Baylor, and Archer, to Montague—not temporarily, until some other county (Clay, for instance) shall be organized, but, apparently, permanently. By the first-named act the county of Wilbarger would have been attached to Clay county after its organization, in 1873,

16

but for the fact that before its organization the legislature attached both Clay and Wilbarger to Montague county, leaving Clay county, upon its organization, stripped of the counties of Wilbarger and others which the legislature, in 1866, intended to attach to Clay for judicial purposes on its organization.

But if the several enactments be reconcilable, so that all can stand, and if the act of August 10, 1870, did not by its terms repeal the act of 1866, still, the later act operates a repeal of the former one on another ground, which is that the legislature, by the two enactments of July 2 and August 10, 1870, embraced the whole subject of laying off the state into judicial districts and providing for holding courts in the several counties, as it was authorized to do by the Constitution of 1869. Art. 5, sec. 6. That this position is true is maintained on the authority of eminent elementary writers and by numerous adjudicated cases.

Says Mr. Sedgwick: "The rule is, as we shall constantly see, cardinal and universal, that, if the statute is plain and unambiguous, there is no room for construction or interpretation." Sedgw. on Const. and Stat. Law, 231. The acts of July 2 and August 10, 1870, are plain and unambiguous, and must stand as the legislative will.

If a subsequent statute be not repugnant in all its provisions to a prior one, yet, if the later statute was clearly intended to prescribe the only rule which should govern, it repeals the former one. 3 How. 636. Affirmations in statutes that introduce a new rule imply a negative of all that is not within the provision. 1 Kent, 467.

The following is an extract from the opinion of the majority of the court on review of the case of *Bryan* v. *Sundberg*, 5 Texas, 424: "It is true that a construction which repeals a former statute by implication is not to be favored, and it is also true that statutes *in pari materia*, and relating to the same subject, are to be taken and con-

strued together, because it is to be inferred that they had one object in view, and were intended to be considered as constituting one entire and harmonious system. But when a new statute in itself comprehends the entire subject and creates a new, entire, and independent system respecting the subject-matter, it is universally held to repeal and supersede all previous systems and laws respecting the same subject-matter. Such is peculiarly the case with the act under consideration. It was framed under a new Constitution, which reorganized the entire frame of the government—of which it was a consequence that every person who should thereafter exercise the functions of any state office must look solely to that Constitution, and the laws enacted subject to it, for his authority and powers.''

So, here, these later acts of 1870 were passed in pursuance of the then new Constitution of 1869, and sanctioned by its provisions.

In a recent case in Nevada this rule is laid down: ''A subsequent statute revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, on the principles of law as well as reason and common sense, operate to repeal the former one.'' *The State* ex rel. *Flack* v. *Rogers,* 10 Nev. 319.

It is, however, insisted further by counsel on the part of the state that, although the act of 1870 may, if constitutional, repeal the act of 1866, the act of 1870 is in conflict with section 12, Article 13, of the Constitution of 1869, in that, as counsel contends, it embraces an object not embraced in the caption of the act, and is, therefore, in conflict with that provision, which is as follows: ''Every law enacted by the legislature shall embrace but one object, and that shall be expressed in the title.''

The title of the act of July 2, 1870, is as follows: ''An act to provide for redistricting the state of Texas into

judicial districts." The title of the act of August 10, 1870, is as follows : "An act prescribing the times of holding the district courts in the several judicial districts in the state."

The Constitution of 1869 provides in Article 5 :

"Sec. 6. The state shall be divided into convenient judicial districts, for each of which one judge shall be appointed by the governor, by and with the advice and consent of the senate, for a term of eight years, who shall, after his appointment, reside within the district, and shall hold a court three times a year in each county thereof, at such time and place as may be prescribed by law."

This extract is made for the purpose of showing what authority was given, by the Constitution of 1869, on the subject of reorganizing the district courts under the new order of things after the late civil war had ended.

There can be no doubt that it was the intention of the framers of this Constitution to organize the district courts for the whole state, and to provide for holding courts regularly in all the counties of the state. So far there is no difficulty ; but, when the legislature assembled under this Constitution, there were certain unorganized counties along the northern and western borders. The Constitution evidently intended that the courts should be held in all the counties of the state ; the legislature provided, as it had authority to do, for holding the courts in the *organized* counties, but it was impracticable to provide for holding courts in the unorganized counties, because they did not contain a sufficient population.

The law-makers must be supposed to have enacted laws with reference to the situation of the country. Is it to be supposed that they, as guardians of the interests of the whole people—as well the pioneer on the frontier as the citizen of the more populous portions—intended either that the scattering population of the border should be excluded entirely from the benefits of the judicial department of the

government, or that these unorganized counties should become places of refuge for violators of the law, and thus place them beyond the reach of its power, and where they could pursue their vicious inclinations unmolested? Such a supposition is not to be indulged; yet such would be the inevitable result unless there is authority somewhere to punish. This authority, it is believed, exists in the legislature; and the legislature, construing its constitutional power for itself, has attempted to obviate the difficulty by attaching the unorganized counties for judicial purposes to those that were organized, and thus in some degree affording their citizens the protection of the law.

But it is contended that all this has been attempted in a manner unauthorized by the Constitution in force at the time; that is, that inasmuch as the title of the act, or rather the titles of the two acts, of 1870, by embodying the provisions above referred to—attaching certain counties for judicial purposes to certain other counties—render the acts obnoxious to the constitutional requirement that " every law enacted by the legislature shall embrace but one object, and that shall be expressed in the title."

Judge Cooley, in his work on Constitutional Limitations, after discussing the origin and necessity of incorporating provisions of this character, treats of the purposes to be effected, as follows:

"It may, therefore, be assumed as settled that the purpose of these provisions was, first, to prevent *hodge-podge* or 'log-rolling' legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles give no intimation, and which might, therefore, be overlooked and carelessly and unintentionally adopted.; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by

petition or otherwise, if they shall so desire." Again: "The general purpose of the provisions is accomplished when a law has but one general object in view, which is fairly indicated by its title. To require every end and means necessary or convenient for the accomplishment of this general object to be provided for by a separate act, relating to that alone, would not only be unreasonable, but would actually render legislation impossible." Cooley on Const. Lim. (3d ed.) 143, 144.

" It could not be meant that the word ' object ' should be understood in the sense of ' provision,' for that would render the title of an act as long as the act itself. Various and numerous provisions may be necessary to accomplish the one general object which this act of the legislature proposes. Nor could it have been intended that no act of legislation should be constitutional which had reference to more than one ultimate end ; for an act having one main or principal object in view may incidentally effect or be promotive of others ; and it would be impossible so to legislate as to prevent this consequence. The intention doubtless was to prevent embracing, in an act having one ostensible object, provisions having no relevancy to that object, but really designed to effectuate other and wholly different objects, and thus to conceal and disguise the real object proposed by the provisions of an act under a false or deceptive title." *Tadlock* v. *Eccles*, 20 Texas, 792.

Other authorities might be cited, but these are deemed sufficient to show that the general tendency is to hold an act constitutional so long as the legislation is confined to the general object mentioned in the title of the act.

The two acts of July 2 and August 10, 1870, are but two branches of one general object, and are not in conflict— the general object being to organize the district courts and to provide for the due administration of the laws in all the counties of the state. The legislature, in furtherance of this

general object, did not transcend its constitutional bounds by attaching certain unorganized counties for judicial purposes to certain other organized counties in which provision was made for administering the law.

We have not overlooked a provision in the Constitution of 1869 which authorized the executive, on certificate of the district judge, under certain circumstances, to attach counties where the courts could not be held, "from the want of qualified jurors, or other cause," to others for judicial purposes. Art. 12, sec. 24. This is believed to be but cumulative of the powers conferred for organizing districts and holding courts throughout the state. We are of opinion that the act of July 2 and the act of August 10, 1870, on the subject of organizing judicial districts and providing for holding regular terms of the courts, are in harmony with the provisions of the Constitution of 1869 ; and, inasmuch as these acts were intended to embrace, and do embrace, the whole subject, they repeal all former laws on the same subject.

And inasmuch as the act of 1866—which provided that, on the organization of Clay county, Wilbarger county (with others) should be attached to Clay county for judicial purposes—had been superseded by the two acts of 1870, above referred to, prior to the organization of Clay county, in 1873, Clay county and the district court thereof had no jurisdiction over an offense committed in Wilbarger county in the year 1874 ; and, because of this want of jurisdiction, the judgment of the district court of Clay county rendered in this case must be reversed, and this prosecution be dismissed.

There are other irregularities apparent on the face of the record of sufficient importance to require mentioning. It does not appear from the record that the defendant was arraigned, or that he either pleaded or stood mute. See *Early* v. *The State*, decided at this term, *post* p. 248.

The clerk, in making up the transcript, has neglected to

observe the rule which requires the transcript to be tied, with the impress of the seal, in wax, over the tie, which is intended as a protection against improper interference with the record after it has been prepared. It is proper these matters should be observed.

Judgment reversed and cause dismissed.

*Reversed and dismissed.*